## FULTON v. COLWELL et al.

(Circuit Court of Appeals, Third Circuit. January 21, 1902.)

**1. REFORMATION OF CONTRACT—MUTUAL MISTAKE.**

Before equity will reform a contract for mistake, the party invoking the relief must show with entire clearness that the mistake alleged has been made, and that it is mutual.

**2. SAME—SUFFICIENCY OF PROOF.**

The denial of the defendant of the existence of a mutual mistake in a contract, is not sufficient to defeat the claim of the other party for reformation, but in such case he must clearly show a real agreement, which the written contract fails to express or violates.

**3. SAME.**

In a suit to reform an absolute contract to purchase a mortgage so as to make the purchase optional with complainant, the testimony showed that the parties made a preliminary provisional agreement, which was afterwards drawn up formally by counsel, who submitted drafts at a meeting at complainant's office, at which complainant, his counsel, and defendant were present. The provisional agreement and both drafts provided for an absolute purchase, and complainant therefore objected to signing the contract. New negotiations were commenced, which continued into the evening, and the parties finally adjourned to complainant's home, where it was later announced that an agreement had been reached, and complainant's counsel undertook to put it in writing. At the next meeting the new agreement was read paragraph by paragraph, and at defendant's instance a new paragraph was inserted. Complainant and his counsel both testified that an optional agreement was intended, but defendant denied that he intended any option. Certain payments were made under the contract, and later complainant, according to defendant's testimony, attempted to induce defendant to take a third party in his place, not suggesting at that time that the contract was optional. *Held* insufficient to show a mutual mistake so as to justify reformation.

Appeal from the Circuit Court of the United States for the District of New Jersey.

R. V. Lindabury, for appellant.

D. J. Pancoast, for appellees.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

GRAY, Circuit Judge. This is an appeal from the decree of the circuit court of the United States for the district of New Jersey (110 Fed. 54), made in a case in which the appellant, complainant below, sought, by a bill filed for that purpose, to reform a written agreement between the complainant and the testator of the respondents, on the ground of a mutual mistake, by reason of which it was alleged that the written contract did not express the real agreement of the parties. The material allegations of the bill of complaint are as follows:

"(1) That on or about the third day of September, in the year eighteen hundred and ninety-one, the Industrial Land Development Company, a corporation of the state of New Jersey, did purchase from said Charles R. Colwell a large tract of land in the county of Atlantic and state of New Jersey, consisting of thirty thousand acres or thereabouts, and did give to the said Colwell, in payment of the purchase price thereof, a mortgage upon the said lands securing the bond or obligation of the said company conditioned for the payment, in five years from the date thereof, of the

sum of three hundred and forty thousand dollars, which said mortgage was or became, under and by virtue of the terms thereof or by agreement between the parties in interest, subject to a mortgage of one hundred and fifty thousand dollars given at or about the same time by the said company to one William Post, covering the same lands, and that both of the said mortgages contained agreements therein providing for releases by the said mortgages from time to time of portions of said lands from the lien of said mortgages, upon the payment by the said company of certain sums as therein stipulated.

"(2) That the said Industrial Land Development Company was organized ·for the purpose of acquiring, developing, and improving the said lands; that its capital stock was three million two hundred thousand dollars, or some such sum (all of which was issued for property purchased); that its scheme of operation contemplated the laying out into streets, blocks, and lots of large portions of the said lands and the sale thereof by lots; that from the proceeds of said sales it was expected that sufficient moneys would be realized to pay the principal and interest of the said mortgages; that the said company did spend large sums of moneys in and about its enterprise, and did sell a large number of lots, and did continue its operations until the ninth of August, or thereabouts, in the year eighteen hundred and ninety-four, when it became insolvent, and ceased to do business.

"(3) That by means of the purchase of the shares of the capital stock of the said the Industrial Land Development Company, mentioned in the agreement next hereinafter referred to, and the acquisition of other shares of said stock soon after the said agreement was made, your orator became the owner of, or controlled, a majority of the capital stock of the said company, and became largely interested in its enterprise, and thereafter expended large sums of money in and about the said company's development.

"(4) That on or about the seventeenth day of August, in the year eighteen hundred and ninety-two, your orator made and entered into a certain agreement with the said Charles R. Colwell, relating, among other things, to the said bonds and mortgages given by the said company to the said Charles R. Colwell as above mentioned, of which the following are the material parts:

"'Articles of agreement made and entered into this seventeenth day of August, A. D. 1892, between Charles R. Colwell, of the village of Weymouth, in the county of Atlantic and state of New Jersey, of the one part, and Elisha M. Fulton, of the city, county, and state of New York, of the second part, in the manner following: The said party of the first part, in consideration of the sum of one hundred and ninety-three thousand four hundred and forty-two dollars, to be paid to him as hereinafter mentioned, hereby agrees to sell unto the said party of the second part, his heirs and assigns, by a proper deed of conveyance, containing a general warranty and the usual full covenants in fee simple, free from all incumbrance, twenty-five hundred acres, in lots of about twenty acres each, known as the "Twenty Acre Lots" on the plan of farms of the late Weymouth Farm and Agricultural Company, situated near Hamonton, in the county of Atlantic and state of New Jersey, and to transfer and deliver four thousand shares of the capital stock of the Industrial Land Development Company. And the said party of the second part, on the delivery of the said deed at the time and in the manner hereinafter mentioned, and the said stock, does agree to pay to the said party of the first part the sum of fifteen thousand dollars, the said sum to be paid and taken as a first installment on account of the entire consideration of this agreement. It is understood and agreed that the said deed will be delivered, and the shares of stock transferred, when and as soon as opportunity can be had for a full and complete investigation of the title of the said premises, and the said party of the first part is able to make the title thereto required by this agreement, at the office of Samuel Fulton, in the Bullitt Building, in the city of Philadelphia, when the said sum of fifteen thousand dollars shall be paid by the said party of the second part. And the said party of the first part does also hereby agree to sell, assign, transfer, and set over unto the said party of the second part a

certain indenture of mortgage, bearing date the third day of September, A. D. 1891, made by the Industrial Land Development Company to him, the said party of the first part, to secure the payment of three hundred and forty thousand dollars, which said mortgage is recorded in Liber 30 of Mortgages for the county of Atlantic, in the state of New Jersey, at page 303, and upon which said mortgage the said party of the first part does covenant that there is now due and owing the sum of three hundred and thirty-seven thousand three hundred and eighty dollars; with interest thereon from September 3, 1891, together with the lands therein described, and the covenants and stipulations therein contained, and the bond or obligation therein recited, and the money due and to grow due thereon, with the interest, for the consideration, at the time, upon the terms and in the manner following, that is to say: First. For the term of ten years, beginning on the third day of September next ensuing the date of this agreement, the said Fulton shall pay to the said Colwell monthly, on the third day of each and every month, five hundred dollars. Said monthly payments shall be on account of the interest accruing on the said one hundred and seventy-eight thousand four hundred and forty-two dollars. Second. That the said Fulton may at any time within the period of ten years from the date hereof pay to the said Colwell the said sum of one hundred and seventy-eight thousand four hundred and forty-two dollars, with interest from the date hereof or the balance thereof, after deducting all moneys received by the said Colwell on account of said sum, as hereinafter provided, and the said Colwell will relinquish any claim he may have to the said bond and mortgage or the said mortgaged lands in case of a foreclosure sale as hereinafter provided, and this agreement shall cease.' "

Then follow provisions in which Fulton agrees to hold the said Colwell harmless from the operation of any other mortgage or lien against the lands and premises described in said mortgage, and the said Colwell covenants that, at the request of the said Fulton, he will release portions of the land, subject to the lien of said mortgage, as provided in the agreement between the said land company and the said Colwell, bearing even date with the said mortgage, and the said Fulton covenants that the proceeds from said releases shall be paid to the said Colwell on account of the principal sum of the above-mentioned consideration, and that all money due from any lease of the mortgaged lands, or arising from sales of wood, coal, stone, or other product of said lands, shall also be applied as payment on account of the said consideration of the said agreement. And it was further agreed that, as soon as practicable after the execution of the contract, the said Colwell should assign to the said Fulton, by a proper deed of assignment, the said bond and mortgage, and the said Fulton should thereupon, immediately and contemporaneously, reassign the same to the said Colwell, as collateral security for the faithful performance by the said Fulton of his promises and covenants in the said agreement contained. It is then provided that "all moneys received by the said Colwell on account of principal or interest of the said mortgage, or derived from releases of the mortgaged lands, from the sales of land in case of a foreclosure of the said mortgage, and the purchase of the mortgaged lands therein, as hereinafter provided, and all money received under the provisions of the last preceding clause of this agreement, shall be credited, as well on account of the principal and interest of the said mortgage as on account of the consideration of $178,442.00 and interest thereon, the consideration of this agree-

112 F.—53

ment"; this sum being the balance of the stated consideration in said agreement of $193,442, after deducting the $15,000 to be paid upon the execution of the agreement. The bill then alleges that at the time of the making of the agreement the complainant paid to the said Colwell the sum of $15,000, as required in said agreement, and received from the said Colwell a deed for the said 2,500 acres of land, known as the "Twenty Acre Lots," and an assignment of the shares of stock in said agreement mentioned, and that until the month of March, 1894, complainant paid monthly to the said Colwell the sum of $500, as it became due under the first clause of said agreement, and that thereafter, and until the giving of the notice hereinafter mentioned, there became due, under said agreement, $500 for each of the months of March, April, May, June, July, and August in the year last aforesaid, which said sums complainant was ready to pay, but was prevented from paying, because, in the said month of March, the said moneys were attached in complainant's hands, on attachment suits brought against the said Colwell; that in August, 1894, complainant notified the said Colwell, in writing, that he elected to terminate and retire from what he calls the option of purchase contained in said agreement, but that the said Colwell claims that the said agreement, so far as it relates to said mortgage, was not an option, but binds complainant to pay absolutely to the said Colwell the said sum of $178,442, with interest thereon from the date of said agreement, at or before the expiration of 10 years from said date, and to pay monthly installments of $500 each and every month from and after said date, to be credited on account of interest on said principal sum of $178,442, until said principal sum should be paid in full. Paragraphs 9 and 10 in the bill then charge as follows:

"(9) That it was the intention and understanding both of your orator and the said Charles R. Colwell, at the time said contract was prepared and executed, that the same should and did give to your orator a mere option, at his election, to buy the said mortgage for the price and in the manner hereinbefore stated, and that your orator should not be personally bound in case he should elect not to take the said mortgage, and that, if the said contract expresses in any wise a contrary intention, it is due to a mutual mistake on the part of both your orator and the said Charles R. Colwell in preparing and executing the same. And your orator further shows that, on referring to the said contract, it appears that the same is ambiguous, and does not fully and clearly express the real agreement between the parties as above stated, and that there are some words and phrases contained therein which may indicate an intention that your orator should be held to the said Colwell personally bound, which words are inappropriate and improper to express the real and true agreement between your orator and the said Colwell, as before stated.

"(10) That the said agreement should be reformed in this honorable court so as to clearly and properly express the true intent and agreement of the parties as above set forth."

In their answer the defendants "deny that there is any ambiguity in the said agreement, that it does not properly express the intention and agreement of the parties at the time of its execution, and that there was any mutual mistake or misunderstanding as to its terms." From the testimony in the record, it appears that the parties to the agreement set forth in the pleadings had a preliminary

agreement in writing, dated the 5th of July, 1892, in which the said Fulton agreed to purchase from the said Colwell the $340,000 mortgage at about one-half of its face value, if so much should be realized from sales of the mortgaged premises applicable to the payment of the said mortgage, and it contained a guaranty on the part of the said Fulton that the amount of said sales should not fall short of the sum of $100,000, said amount to be paid within 10 years from the date of the agreement, with the provision for the payment of the $500 a month as interest on the said $100,000, with adjustment of the amount in case payment of the said sum of $100,-000, or part thereof, should be anticipated. It was understood that this agreement was to be provisional, and should be embodied in a more formal agreement, thereafter to be drawn under the direction of the respective counsel of the parties. It was accordingly submitted to Mr. Abbott and Mr. Day, counsel for Colwell and Fulton, respectively, with a request that each of them should prepare a draft of a contract, based on the terms of that of July 5th. This was done, and a meeting was arranged for at the office of Mr. Fulton, in New York, in which he and Colwell and Mr. Day, as counsel for Fulton, were present. The drafts of both Abbott and Day were read, and Mr. Fulton and his son and Mr. Day testify that he (Fulton) objected to any absolute agreement to pay $100,000, and declared that he had not intended and was not willing to purchase Mr. Colwell's mortgage, or to become bound to pay anything absolutely; that he only wanted an option, and would sign for nothing else, and had not understood the contract of July 5th as anything more; although the last-named preliminary contract contained such an absolute engagement on Fulton's part, in unequivocal terms, and the draft made by Mr. Day, as counsel for Fulton, and that made by Mr. Abbott, as counsel for Colwell, contained the same. These drafts were exchanged by them, and seem to have been satisfactory, and were believed by them to be substantially a correct formulation of the agreements of the parties. The parties thereupon began to negotiate anew, and continued their negotiations through the day and into the evening. They then adjourned to Mr. Fulton's house in the country, where a substantial agreement was announced to have been reached, and Mr. Day, counsel for Mr. Fulton, undertook to put it in writing, and was all the evening preparing his notes for that purpose. Mr. Colwell testifies that neither in the negotiations at the New York office, nor at the house, nor at any time before the signing of the agreement, was the word "option" used by Mr. Fulton, nor did he (Colwell) have any thought, purpose, or intention of signing an agreement merely giving him (Fulton) an optional right to take the mortgage. Day, Fulton's counsel, testifies that at the house they continued their work on the two agreements that had been submitted until about 11 o'clock at night; that he had the drafts on different slips of paper, and understood that everything had been settled, except having it written out on the typewriter, which was done the next morning; that, after it was so written, he (Mr. Day) brought the agreement, and it was read over, paragraph by paragraph, to the parties. Colwell made

some further objections, and to meet them an additional paragraph was inserted. The testimony of Mr. Day and of Mr. Fulton agrees with that of Mr. Colwell that the contract as written was accepted by all parties as expressing their agreement, although they both declare that it was intended that merely an option should be given to Fulton to buy the $340,000 mortgage within 10 years for $178,-442; he in the meantime, and until the option was exercised, paying $500 a month to Colwell. Colwell testified, in support of the allegation to his answer, that no such option was agreed upon or intended by him, and that the contract as written expressed the understanding of all the parties. This, and the testimony that the contract was executed as to those things which required immediate performance (such as the payment of the $15,000, and the delivery of the deeds for the 2,500 acres of land, and the transfer of the 4,000 shares of stock), and that the payments of $500 a month continued for two years, constitute the case before us, except that it was testified in behalf of the defendant Colwell that Fulton had endeavored to get Colwell to take the company called the "Weymouth Manufacturing Company" in place of his individual responsibility, and that he (Fulton) expressed himself as anxious to be released from that responsibility, and that several interviews or conversations of this kind took place in which Mr. Fulton never said or suggested, in terms or substance, that his obligation to purchase the mortgage was optional, and not binding upon him. This was testified to by an independent witness, who also had had such conversations with Mr. Fulton, and was present at the conferences between Mr. Fulton and Mr. Colwell. This was six or eight months before Colwell received the notice from Fulton terminating the agreement on the ground that he had an option so to do.

The jurisdiction of a court of chancery to relieve against a mutual mistake, whereby a written instrument is so drawn as to express a meaning contrary to the intention of the parties, is well settled, and dates from an early period in the development of equitable remedies. In the exercise of such a jurisdiction, the relief administered by the court will extend to the cancellation of a contract, or to its reformation, so as to make it conform to the precise intent of the parties. The mistake for which such jurisdiction may be invoked is commonly one of fact, though it may be exercised in the case of a mistake of law, owing to which the agreement as written does not fulfill or violates the manifest intention of the parties thereto. Hunt v. Rousmaniere's Adm'rs, 1 Pet. 1, 7 L. Ed. 27.

Before such relief can be granted, however, the party invoking the interference of the court must show with entire clearness that the mistake alleged has been made, and that it was mutual; that is, it must clearly be shown that the minds of the parties had met as to certain matters, and that the paper, as written, failed to express that agreement. The denial of the defendant of the existence of any mistake is not sufficient to defeat the claim of the other party to the contract, but in such case it will rest upon the complainant to clearly prove a real agreement between the parties which the written instrument fails to express or violates. In the case be-

fore us we do not think the complainant has complied with this requirement, in that he has failed to clearly show that the result of the negotiations between the parties, on the 16th of August, 1892, extending through the entire day and evening, resulted in an agreement which was not expressed by the instrument signed the next morning. While there was much testimony as to objections by Mr. Fulton, during the course of the negotiations, to making an absolute agreement to pay $178,442 for Colwell's mortgage, and as to his assertion that he intended only to reserve to himself an option in that respect, there is no clear and satisfactory evidence that, at the end of the long day's conference over the terms of the agreement, or the next morning, when it was signed in typewriting, the contract, as written, expressed other than the final agreement of the parties thereto. This failure on the part of the complainant is emphasized by the testimony (denied, it is true, by complainant) that he, the complainant, had sought, some months prior to his notice dated August 28, 1894, to be released by Colwell from the obligations of his contract to purchase the mortgage, and that in those interviews with Colwell and another independent witness to the same effect nothing was said by Fulton as to his having, under the contract, merely an option to purchase within 10 years; also by the fact that the preliminary agreement of July 5, 1892, and the drafts of permanent contracts, made by the respective counsel for the two parties, in pursuance of what they conceived the intention of the parties to be, all contained an absolute provision for the payment of a sum of money at all events, in consideration of the assignment of the mortgage, although this sum was $100,000 instead of $178,442. It is also not without significance that Fulton's counsel, Mr. Day, was not only present, but assisted in the conduct of the negotiations, on the 16th of August, 1892, and actually put the contract into the shape in which it now appears. It is not disputed that it was read over, paragraph by paragraph, to both parties before signing, and that Mr. Colwell was the only one who insisted upon a change, by the insertion of the twelfth and last paragraph in the written agreement, by which the parties bind themselves to the due performance of the covenants and agreements in said contract contained, in the sum of $178,442, the exact amount of the consideration to be paid for the mortgage, "said sum to be a lien upon said bond and mortgage and shares of stock, and to be considered as liquidated damages."

Under the circumstances, no question of fraud respecting either the preparation or execution of the contract was or could be raised, and, to use the language of the learned judge in the court below, "as the case is presented it is impossible for the court to say that the proof of a mutual mistake is so clear, satisfactory, and free from doubt as to entitle the defendant to the relief prayed for."

The decree of the court below is therefore affirmed.