JAMES E. MCDANIEL, ARTHUR W. HAMBY, THEODOTUS C. HAMBY, THOMAS W. WATERS, and CHARLES M. GALLOWAY,

*vs.*

FRANKLIN RAILWAY SUPPLY COMPANY, a Delaware corporation.

*New Castle, Aug. 4, 1934.*

328

*Clarence A. Southerland,* of the firm of Ward & Gray, and *Selden Bacon,* of New York City. (*L. L. Hamby,* of Washington, D. C., of counsel), for complainants and cross-defendants.

*Caleb S. Layton,* of the firm of Richards, Layton & Finger, and *Francis De H. Janvier,* and *Thomas G. Haight,* of Jersey City, N. J. (*M. S. Hottenstein,* of New York City, of counsel), for defendant and cross-complainant.

THE CHANCELLOR: 1. Upon the question of reformation, I find myself unable to agree with the master's conclusion. Mistake as a basis for the relief of reformation must be shown by evidence that is clear, convincing and free from doubt. *Mead, et al., v. Westchester Fire Insurance Co.,* 64 *N. Y.* 453; *Christopher & Tenth St. R. R. Co. v. Twenty-Third St. Ry. Co.,* 149 *N. Y.* 51, 43 *N. E.* 538. Mere preponderance of the evidence will not satisfy the burden of proof resting upon the party who alleges the mistake upon which the relief of reformation is sought. *Philippine Sugar Co. v. Philippine Islands,* 247 *U. S.* 385, 38 *S. Ct.* 513, 62 *L. Ed.* 1177. It is elementary that mistake is not a ground for reformation unless it be mutual. The cases just cited might be supplemented by a host of others as establishing that elementary proposition. He who asks that the mutually accepted language in which a contract is expressed be rejected as the correct embodiment of the common intent which it purports to be, has a burden to carry which is heavier than is ordinarily imposed on the affirmer of a fact. And this burden, if it is not increased, certainly ought not to be diminished when it appears, as it does here, that the allegedly erroneous language is that of the party who assails it as carrying a mistaken intent.

The nub of the controversy over whether a mistake was made lies in the phrase "actual increase in cost of

materials used in the manufacture of the same over present basis." The phrase appears in the 1917 contract and in the 1919 contract. I agree with the master that "present basis" means the basis of June 1, 1917, the date of the contract of that year. This is so, because the sole purpose of the 1919 contract was to substitute the individual complainants as licensors in the place of the Wedge Company to whose rights the individuals had succeeded.

The phrase had its antecedents in the written negotiations which preceded the 1917 agreement. Prior to that agreement the royalty was a percentage one. It was claimed by the defendant to have been too burdensome. The Wedge Company was willing to lighten it by agreeing to a royalty based on a flat rate per wedge on the assumption that there would be no increase in the prices then charged by the defendant for the wedges. If there was an increase in prices, the Wedge Company felt that it should share in the additional profit occasioned thereby. It was advised by the defendant in its letter of July 25, 1917, that it had been definitely decided by the defendant not to increase the present prices "except to cover any actual increase in cost of materials over present basis," that as to any increase due to that cause the Wedge Company ought not to expect to share therein, but that if there was any arbitrary increase in prices not based "on actual increase in cost," the defendant would be willing to pay the Wedge Company as royalty twenty-five per cent. of such increase. The Wedge Company replied on August 9, 1917, and said, after quoting the defendant's statement that it had "no objection to setting forth that you (Wedge Company) should receive twenty-five per cent. of any arbitrary raise in prices not based on actual increase in cost," that it, the Wedge Company, would be glad to have the defendant frame a covenant in the contract covering this.

The defendant thereupon undertook to frame the suggested covenant and did so in the following language:

"In the event of the Franklin Railway Supply Company arbitrarily increasing its present prices for said axle box wedge, except to cover any actual increase in cost of materials used in the manufacture of the same over present basis, the M-H-Automatic Adjustable Wedge Company shall receive as royalty twenty-five per cent (25%) of any such arbitrary increase in selling price."

I pause here to express agreement with the master's conclusion that "such increase in cost" in the last sentence of the second paragraph of the defendants letter of July 25, 1917, is but an abbreviated re-statement of the larger phrase appearing earlier in the paragraph, viz., "actual increase in cost of materials over present basis," and that the former means the same as the latter. The shorter phrase, when used by the Wedge Company in its letter of August 9, 1917, in accepting the defendant's suggestion *in ipsissimis verbis,* is to be taken in the same sense.

It is to be noted that the phraseology of the contract departs slightly from the phraseology of the correspondence leading up to it. What I have called the larger phrase of the defendant's letter of July 25, 1917, is carried into the contract with the added words—"used in the manufacture of the same." This addition was made by the defendant itself. The master has concluded that the contract should be reformed by the elimination of that phrase. I do not think so. When a manufacturer speaks of cost of materials, he must mean cost of materials which enter into the manufacture of his product. What other materials can he be speaking of?

But the defendant did not do its own manufacturing business. It had a contract with the Venango Company by which that company manufactured the devices exploited by the defendant on the basis of actual cost plus twelve and one-half per cent. profit. There is no evidence that the Wedge Company knew of this situation when the contract of June 1, 1917, was executed. The defendant had repeatedly referred in its correspondence with the Wedge Company to the plant where its products were manufactured

as its factory. It treated the Venango operations as its own or rather as though they were conducted by itself on its own account. When, therefore, it spoke of "cost of materials," in both its correspondence and in the contract, I think the expression is to be understood as meaning exactly what it would mean if the defendant had been in fact its own manufacturer.

This view is confirmed by the defendant itself in the letter of December 6, 1919, in which the contract relations between the defendant and the Venango Company are referred to as explanatory of the manner in which the contract with the Wedge Company was written to cover only increased costs of materials. It appears to me that when the defendant on its own motion inserted in the contract the phrase "used in the manufacture of the same," it did so in order to adjust the language of the contract to the peculiar fact situation which existed. Why, do I say that? Because, if the phrase were not meant to carry back to Venango's costs of materials, it was entirely superfluous. "Cost of materials" as now sought to be interpreted by the defendant, standing alone, would have sufficed.

The master concluded that the phrase—"used in the manufacture of the same"—should be eliminated from the contract on the theory that its presence is due to a mutual mistake. The consequence follows from that conclusion that "cost of materials" would stand unmodified by the elided phrase. Then what is the "cost of materials"? The master answers by saying—cost to the defendant; and that means all the costs of Venango, labor as well as material, plus twelve and one-half per cent. I cannot, as before stated, agree with his conclusion on that point. When it is remembered that the defendant was not a manufacturer of the device but stood in the relation of a purchaser of the same from a manufacturer, it seems to me that "cost of materials" as applied to the defendant is a wholly inappropriate expression. The apt expression would be cost of the

wedges made for and purchased by the defendant. Thus the contract as revised by the master is left with an inaptitude of expression that does not harmonize with the fact situation.

The complainants have excepted to the findings of the master that the contract be reformed to the extent indicated by him. This exception will be sustained.

The defendant also excepted to the master's recommendation that the contract be revised, and the ground of its exception is that the reformation as recommended by the master did not go far enough. The defendant contends that the master should have found that the contract should be reformed by eliminating the words "of materials used in the manufacture of the same," so as to leave the phrase as follows, "except to cover any actual increase in cost."

If the defendant's views be accepted, the result will be that the twenty-five per cent. royalty would not be payable on increased selling prices if such increase did not exceed the cost to the defendant; and "cost," according to the defendant's contention, would include not only the cost of manufacture plus twelve and one-half per cent. paid to Venango Company, but as well the proportionate burden of overhead of the defendant company allocable to the Wedge account, including bonus to its officers.

This contention is built up by an argument based on the word "arbitrary" and by another view which I shall presently mention.

I agree with the master that the words "arbitrary" and "arbitrarily" where they appear in the contract do not have the effect of enlarging the royalty-exempt price-increase to the extent contended for by the defendant. Those two words mean nothing more to me than that the defendant, who was at liberty to name any selling price it chose, should not exercise that liberty beyond the designated extent without paying the twenty-five per cent. royalty.

The other argument to which I just referred which the defendant makes as sustaining its view that the parties intended to allow price increase up to the point of cost in the broadest sense of the word, starts from the conception that the parties before entering into the contract had agreed that the defendant should not pay the twenty-five per cent. royalty on price increases until the point had been reached where the price increase would yield to the defendant a larger profit on the Wedge account than twenty-five per cent. I find absolutely no warrant in the evidence, as the master found none, to justify the conclusion that the intent which the parties had mutually agreed upon was to permit increases in prices so as to assure the defendant a profit on the Wedge account of twenty-five per cent.

It is true that in a draft of suggestions to be embodied in the contract of June 1, 1917, there was a proposed recital to the effect it was the desire of the Wedge Company that the defendant should realize a twenty-five per cent. profit on the Wedge account. As an aid to that desired end the Wedge Company was willing to change the existing royalty basis. But that the Wedge Company ever indicated the slightest purpose to cooperate with the defendant in its desire to realize a twenty-five per cent. profit beyond surrendering its ten per cent. royalty and substituting therefor a flat royalty is manifest to my mind beyond doubt. The defendant was representing to the Wedge Company that the royalty basis preceding June 1, 1917, was causing it to fall short of its accustomed profit of twenty-five per cent. The correspondence between the parties preceding that date very clearly shows that the Wedge Company was willing to absorb a "part" of the loss of profits which the defendant was suffering. For the defendant to say now that the Wedge Company intended to agree that the increase in prices should first be absorbed in taking up the entire slack in the defendant's accustomed profits, before the twenty-five per cent. royalty clause came into play, is going to an extent that is thoroughly unwarranted.

The defendant's exceptions to the master's findings on the question of reformation will be overruled.

The defendant, through its solicitors, suggests that the complainants are estopped from insisting that the costs are confined only to the costs of materials used in the manufacture. The argument is that the complainants knew that if the defendant was aware of the complainants' construction of the contract the defendant would have exercised its right to terminate operations under it and save itself from further deprivation of the desired profit on the Wedge account.

I can find no basis on which to predicate estoppel as contended for. The fact appears from the evidence that as soon as the complainants suspected that the increase in prices exceeded the increase in cost of materials used in the manufacture, they made demand for their twenty-five per cent. royalty. The defendant replied to this demand to the effect that the price increase did not exceed the cost of materials. The complainants certainly were entitled to accept the defendant's assurance that no increase in price beyond the point allowed by the contract as construed by the complainants had taken place. The complainants claim, and their evidence is not refuted, that they had no knowledge of the facts contradicting the defendant's assurance until 1927 when the contract had expired with the life of the patents.

On November 5, 1919, the defendant was very plainly advised by the complainants that the permissible increase in price was confined strictly to the increase in cost of' materials only. I do not find in the record anywhere that the defendant in the face of that very specific statement of position by the complainants took any steps to clarify the situation, or to advise the complainants of the defendant's disagreement with their point of view. The complainants did not deceive the defendant into a mistaken understanding of the complainants' contention of what 'the

contract meant, nor mislead the defendant in that regard.

I conclude under this head of the case, that the contract should not be reformed as prayed for by the defendant in its cross-bill. I doubt very much if there was any mistake on the part of even the defendant itself. I am quite clear in the view that if the defendant did labor under a mistake it was not one mutually participated in by the complainants.

2. I take up next the question of whether royalty should be paid upon parts. The contract does not license the defendant to manufacture and sell parts. The license is "to manufacture and sell the wedges" and the royalty is payable on "each and every automatic adjustable wedge equipment made in its entirety."

Before the original contract was made the Wedge Company desired that the contract should exact a royalty from the defendant upon the manufacture and sale by it of parts. The defendant was unwilling to accede to that desire, representing to the Wedge Company that it did not propose to sell parts except within the limits allowed to a licensee by the general principles of patent law, namely, to the extent that a purchaser of a complete wedge would be allowed to repair the same in order to keep it in workable condition. Upon that representation the Wedge Company abandoned its insistence that a royalty should be paid upon the sale of parts.

The contract is silent with respect to parts. It appears from the testimony that the defendant in operating under the contract sold a very large quantity of parts upon which no royalty was paid. The master's report gives the details of volume with respect to these sales. He concluded that the defendant should be required to account for and pay royalties upon 16,500 wedges sold under the guise of parts. I find myself unable to agree with the master in his conclusion under this head. If the defendant sold parts under such circumstances as to warrant the conclusion that its

sales of parts were in reality sales of wedge equipment "made in its entirety," then the defendant should pay the royalty specified in the contract. If the sales of parts were merely of parts as such, and if such was permissible under the principles of patent law as an incident to the main license right as is contended, then of course nothing would be due to the complainants for such sales in any view of the matter. If, however, the sales of parts as such were not permissible under the principles of patent law applicable to the subject and did not amount to an indirect sale of wedges in their entirety, then the sales of such parts were infringing sales and this court would have no jurisdiction to entertain a suit for an accounting therefor.

The bill in this case is filed for an accounting under the contract. Any accounting that the defendant owes by reason of the contract must be an accounting for wedges sold in their entirety.

The complainants, I think, are correct in their contention that what they are seeking by way of accounting in connection with the sale of parts, they are seeking strictly as a matter of contract right and not as complainers against a patent infringer. The master correctly took the same view. The difficulty I find, however, with the master's conclusion is, that he appears to have accepted the figure of 16,500 as the number of wedges sold in their entirety under the guise of parts; and he recommends that the defendant be required to account on that basis.

I think that the accounting as to parts should not be cast in the rigid form which the master's report recommends. The defendant should be called upon in the interlocutory decree to account for the sale of parts to the extent that such sales fall within the terms of the contract as to sales of wedges in their entirety. If, on taking the account, sales of that character are disclosed, the defendant should be required to pay the designated royalty. To the extent that sales of parts are not shown to be of that char-

acter, the account should disregard them for lack of jurisdiction.

3. I now come to the so-called Essen order. The master held that the defendant was not liable to account to the complainants for this order. I think his conclusion is correct. The invention owned by the complainants was not protected by a German patent. The Essen firm in Germany desired to purchase 650 wedges. The testimony seems to be undisputed that the purchaser, if the wedges were shipped from America, would be required to pay a rather heavy import duty. In order to avoid the burden of that duty the proposed purchaser made arrangements with the defendant to secure blueprints of the wedge and itself manufacture its requirement in Germany. It paid to the defendant, however, the full purchase price of the wedges just as though the same had been made and shipped by the defendant. The complainants appear to take the view that very many more than 650 wedges were involved in this contract. The evidence, however, discloses the facts to be as I have above stated. Though no wedges were ever sold, yet the defendant paid to the complainants royalty on the theoretical sales. I can see no basis on which to hold the defendant for any further accounting in connection with that order.

4. Finally as to interest. I agree with the principle of the master's conclusions under this head. Interest should be allowed to the complainants from the respective dates when royalties should have been paid. *McCornack v. Sharples,* 254 *Pa.* 541, 99 *A.* 155; *Muther v. United Shoe Machinery Co.,* (*D. C.*) 21 *F.* (2d) 773.

An order disposing of the exceptions to the master's report will be made in accordance with the foregoing, and an interlocutory decree in due course entered.