GEORGE M. COLVOCORESSES,

*vs.*

W. S. WASSERMAN CO., a corporation of the State of Delaware.

*New Castle, October 16, 1942.*

334

*Dudley C. Lunt,* for complainant.

*Aaron Finger,* of the firm of Richards, Layton & Finger, (*Philip Werner Amram,* of Philadelphia, Pa., of counsel) for defendant.

THE CHANCELLOR: This is a bill to reform a contract executed by both the complainant and the defendant. The controversy relates to the interpretation of the language used in Article V., and whether it carries out the real intent of the parties; whether a material provision, relating to certain payments to be made to the complainant on certain conditions therein stated, and alleged to be in the nature of commissions, was intended to be wholly unconditional. The provisions of the various contracts and assignments, preceding the contract in controversy, are somewhat complicated, and need not be set out in detail; they have been stated, with some particularity, at other stages of the case, both in the Superior Court and this court. *Colvocoresses v. W. S. Wasserman Co.,* 8 *W. W. Harr.* (38 *Del.*) 253, 190

*A.* 607; *Id.*, 9 *W. W. Harr.* (39 Del.) 71, 196 *A.* 181; *Colvocoresses v. W. S. Wasserman Co.*, 24 *Del. Ch.* 53, 4 *A.* 2*d* 800.

Briefly, Colvocoresses, the complainant, under a contract with one Reid, held certain defeasible option rights in the mill tailings and mine dumps on the Congress mine property in Arizona, which he agreed to assign to the Wasserman Company upon payment of $6,000, pursuant to the terms of a prior contract between other persons. Those rights related to the extraction of ore from the tailings and dumps, and included certain incidental possessory rights which need not be explicitly stated.

Reid did not have the legal title to that property, but, by assignment from one Clark, held a contract giving him the right to purchase it, including the mine tailings and dumps thereon. Under the provisions of the contract between Reid and Colvocoresses, the latter had the right to receive "a good and sufficient conveyance of any and all of the mine dumps and mill tailings * * *," if and when Reid acquired "a valid and legal title to the same." On payment of the agreed consideration for the tailings and dumps ($6,-000.) Reid was to execute a good and sufficient conveyance therefor, but this conveyance was to be "held in escrow and not delivered to" Colvocoresses "until and unless" Reid or Colvocoresses "on his behalf, shall in due season and pursuant to the terms of the Congress Contract and this instrument acquire a valid and legal title to the same by completing and carrying out all of the terms and conditions of the 'Congress Contract' and this instrument, including the full payment of the remainder of the purchase price."

The first phrase of Article V. of the contract between Colvocoresses and the Wasserman Company provided:

"In the event Second Party (the defendant company) acquires the tailings and dumps covered by said Congress Contract."

It then gave certain rights to the complainant, in addition to a $500.00 consideration, the payment of which

was provided for by Article I. These rights, made contingent upon the defendant acquiring "the tailings and dumps covered" by the "Congress Contract," consisted of two things:

(1) A 5% non-assessable interest in the tailings and dumps.

(2) His employment by the defendant company as manager for the exploitation and treatment of the tailings and dumps, at a salary of $500.00 per month, with an option on either party to terminate that relation; in case of the termination of the complainant's employment during the first year, he was entitled to either an additional 5% interest in the tailings and dumps, or to the payment of $12,000 in cash, at his option.

Article VI also provided:

"Nothing in this agreement contained shall be deemed to bind Second Party either to acquire any of the property herein mentioned or thereafter to develop and exploit the same, or to continue to develop the same, it being intended that Second Party shall at its own sole discretion acquire, develop and/or exploit any of said property or refrain from doing so as it sees fit."

The complainant seeks to have the first phrase of Article V reformed, so as to read:

"In the event Second Party (Wasserman Company) acquires the rights and privileges under the Reid Agreement with respect to the tailing and dumps."

The very purpose of reformation by a court of equity is to make an erroneous instrument express correctly the real agreement between the parties; no court can make a new contract for them. *Home Life Ins. Co. of America v. McCarns*, 25 *Del. Ch.* 220, 16 *A.* 2d 587; 5 *Pomeroy's Eq. Jur.* (*2d Ed.*) § 2097. The right may be exercised in a clear case when the alleged mistake sought to be corrected relates either to the contents of the instrument, or to the real meaning of the language used. 5 *Pom. Eq. Jur.* (*2d Ed.*) § 2096.

In the absence of some element of fraud, such a mistake must be mutual and common to both parties; a mere unilateral mistake is not within that rule. *Home Life Ins. Co. v. McCarns, supra;* 5 *Pom. Eq. Jur.* (*2d Ed.*) § 2097. It necessarily follows that a clear mistake by one party, coupled with ignorance thereof by the other party, is not a mutual mistake, and will not be corrected. *Home Life Ins. Co. v. McCarns, supra.* But when the mistake of one party, with respect to the meaning of some material provision of the signed contract, is accompanied not only by the other party's knowledge thereof, but also by his silence, it is said to be equivalent to a mutual mistake (*Williston on Contracts* (*Rev. Ed.*) 1548; 5 *Pom. Eq. Jur.* (*2d Ed.*) § 2097, *note;* 3 *Pom. Eq. Jur.* (*5th Ed.*) § 870, *A*) ; at any rate, while not strictly a mutual mistake, equity will reform the instrument. *Weightman v. Weightman,* 342 *Pa.* 8, 20 *A.* 2d 215; *Town of Essex v. Day,* 52 *Conn.* 483, 1 *A.* 620. Perhaps silence on the part of the defendant, under such circumstances, is regarded as a species of inequitable conduct in the nature of fraud, of material importance; the mere mistake of one party is not the only element involved. 5 *Pom. Eq. Jur., supra,* § 2097; 3 *Pom. Eq. Jur.* (*5th Ed.*) 870, *A; Chelsea Nat. Bank v. Smith,* 74 *N. J. Eq.* 275, 69 *A.* 533. Common honesty would seem to forbid the acquisition of contract rights by one party, knowing that the other party is laboring under a mistake as to the real meaning of the language used but in order for a written instrument to be reformed, the parties must have come to a complete, mutual understanding, with respect to the essential terms of their bargain; otherwise, there would be no standard by which it could be reformed. *Williston on Contracts* (*Rev. Ed.*) § 1548; see, also, *Home Life Ins. Co. v. McCarns, supra.* It has been said that the correction of an erroneous instrument does not, of necessity, rest upon the assumption that a prior, definite, oral contract, binding the parties, had been made but was incorrectly recorded. *Wigmore on Evid.* (*2d Ed.*)

§ 2417; *Williston on Contracts (Rev. Ed.)* § 1548. This does not mean, however, that an understanding, short of contract, can under no circumstances be changed in any contract subsequently made. Applying these principles, the question for the court to determine is one largely of fact. *Fulton v. Colwell,* (3 *Cir.*) 112 *F.* 831; *Jones on Evid.* (2d *Ed.*) §1524. But the complainant's proof must be clear, convincing and free from doubt; mere preponderance of the evidence is not sufficient. *McDaniel v. Franklin Ry. Supply, Co.,* 20 *Del. Ch.* 327, 174 *A.* 375.

The negotiations on behalf of the Wasserman Company, for the purchase of the complainant's option rights in the tailings and dumps on the Congress Mine property, were conducted by D. M. Barringer, Jr., and began early in February of 1935. The contract sought to be reformed was finally drawn on February 11th, but was not executed until February 15th, 1935. Prior to February 11th, the complainant had drawn a tentative agreement. Barringer had no authority to conclude a contract binding the Wasserman Company, but Colvocoresses hoped that the terms of this memorandum would form the basis of the contract which probably would be made on a subsequent date. The provisions of Article V of that memorandum would have protected the complainant's alleged unconditional rights to the compensation provided for in the contract, including the liquidated compensation on the termination of his relation as an employee of the Wasserman Company. In order for that company to be liable, that memorandum did not require the acquisition of the "tailings and dumps covered by" the "Congress Contract." It merely provided in the event second party, the Wasserman Company, exercised the Reid option and made the payments provided for in Article IV, etc. Whether Barringer originally clearly understood its unconditional meaning is perhaps subject to some question; but whether because of his optimism as to the value of the tailings and dumps, or otherwise, apparently he was not anxious to

change that provision. At any rate, the complainant concedes that prior to the execution of the instrument sought to be reformed, all negotiations and understandings with Barringer were merely in the preliminary and tentative stage, and were binding on no one. See *Universal Products v. Emerson,* 6 *W. W. Harr.* (36 *Del.*) 553, 179 *A.* 387, 100 *A. L. R.* 956. He concedes that prior to the execution of that instrument, neither party had acquired any real contract rights. *Id.* Prior to February 11th, Barringer consulted an attorney, on behalf of the Wasserman Company, and showed him the tentative draft drawn by Colvocoresses. Barringer was then told that Article V was entirely too favorable to the complainant, and should be changed when the contract was drawn. He was advised that on payment of the $6,000 and the acquisition of the option, the Wasserman Company would be assuming definite obligations to Colvocoresses, even though, after an investigation, it should conclude that the exploitation of the tailings and dumps would be unprofitable. It does not appear that this matter was discussed with Colvocoresses prior to February 11th; but on that day the parties and their legal advisers met, and after an extended discussion, which continued most of the day and into the early evening, the contract in controversy was finally drawn. It seems that Article V was the provision that was difficult to agree on. It was repeatedly drawn and redrawn, but ultimately the change in the first phrase was the only change made in the tentative article drawn by the complainant. When its language was finally agreed on, Article VI, which had not appeared in the preliminary draft, was added. Both of these changes were apparently made, largely at the suggestion, and perhaps on the insistence, of the attorney for the Wasserman Company, but were approved both by Colvocoresses and by his legal adviser. No other material changes were made in the tentative draft. As we have seen, the contract was not executed until four days later. The evidence clearly shows that the

language of Article V carried out the intent and purpose of the defendant's agents on February 11th; that whatever the prior position of Barringer may have been, they did not then intend to make the Wasserman Company liable to the complainant, except for the payment of a very small sum, provided for in a prior article, unless that company exercised its option rights and acquired title. But the precise question is whether the complainant understood that such was the real meaning of Article V, and whether the defendant, knowing that he construed that article in a very different manner, nevertheless silently permitted him to execute the contract under that mistaken belief. Such a mistake, when clearly proved, justifies a decree for reformation. But the presumption that an instrument as drawn and executed, correctly states the real intent of the parties, is difficult to overcome, and a court of equity will not reform it without clear and wholly satisfactory proof of mistake.

Barringer testified:

"A good part of the efforts of Mr. Mackay (the defendant's attorney) and myself during the discussion (February 11th) were directed towards pointing out that Article V., as newly drawn, would prevent us having to pay a commission in case something interfered with our acquiring the mine."

Other statements made by him are substantially to the same effect. He further testified:

"There was both the question of protecting them against loss of the—against not acquiring the mine because of third persons coming in and prosecuting liens that might prevent us acquiring the mine; and secondly, not acquiring the mine because we decided we should not exercise our option."

Colvocoresses claims that his general unconditional rights to the various agreed payments in the nature of commissions, were not openly questioned on February 11th; were in fact conceded. There is some evidence to that effect, but it is difficult to tell whether it is based on positive evidence of statements made by the defendant's agents, or

on mere conclusions of the witnesses, as to their intent. Colvocoresses points out that, aside from the testimony of Barringer, the evidence shows, without contradiction, that two reasons, and only two reasons, were given by the agents of the Wasserman Company for changing the language of the tentative draft of Article V.

1. That if the claim of one Jay Burns under a prior lease of the Congress Mine were valid, the Wasserman Company could acquire no rights whatever under the Colvocoresses option, and that "the first sentence of Article V" should, therefore, relate back to the Congress contract rather than to the Reid agreement.

2. That the right to elect between percentages and cash payments to Colvocoresses should be in the Wasserman Company in order that, if the exploitation of the tailings and dumps should be unprofitable, it could pay him off and get rid of him.

The undoubted insistence on a reference to the Congress contract in Article V, instead of to the more restricted Reid agreement, is regarded as unimportant, in view of the fact that the explanation given is said to merely refer to protection against the Burns claim. The alleged restricted nature of the second explanation is even more strongly stressed. On complainant's refusal to agree that the option rights, with respect to an additional 5% interest in the tailings or dumps, or the payment of a liquidated sum, provided for by Article V, should be given the defendant, a witness testified that the attorney for that company finally said: "Well, if you are going to have your way about that, I will add another paragraph (Article VI.) which will give us an option to continue or not as we please." Colvocoresses construes that language quite strictly. His solicitor, in his brief, claims that "the standard by which the contract should be reformed is the oral understanding involved in the affirmation by" the defendant's attorney, "and the acceptance by

Mr. Colvocoresses of the proposition that Wasserman Company would then be in a position when Colvocoresses could be paid off." He says, "upon this understanding, the approval of the substitute language rested." He claims that this explanation does not purport to make the complainant's rights conditional on the exercise of the option given; that it merely relates to possible subsequent limitations on the defendant's clearly intended liability. But there are other facts and circumstances that are difficult to reconcile with the complainant's alleged ignorance of the intended meaning of the contract, as drawn and executed. While not a lawyer, he was a mining engineer of experience, and apparently had considerable ability in drawing contracts of this nature; to have drawn the tentative draft he must have been thoroughly familiar with the provisions of all of the prior contracts and assignments, including the Congress contract. The contract in controversy was drawn only after a long discussion over its terms, and Article V of the tentative draft was undoubtedly rejected. The alleged correction sought to be made in Article V of the contract, is almost in the language of the proposed draft of that article. Moreover, Article VI is the logical result of Article V, and would seem to have no real practical meaning without it. It emphasizes the contingent character of the rights given by Article V. Furthermore, the complainant concedes that the alleged right to reform the contract necessarily depends on whether the testimony of Barringer, as to the explanation given for the change in Article V on February 11th, is thoroughly discredited by other portions of the evidence. He has not sustained that difficult burden. There are facts and circumstances after that date, which at a glance may seem difficult to harmonize with Barringer's testimony— that the contract rights of Colvocoresses were intended to be wholly conditional, and that the latter knew it when that instrument was drawn. Colvocoresses assigned his option rights to the Wasserman Company on March 2nd, 1935;

he was immediately employed as manager to exploit the tailings and dumps, and was paid the prescribed salary of $500 for the month of March; his subsequent letter of resignation as such manager, was expressly accepted and approved by Barringer, on behalf of the defendant company; Barringer's telegram of February 25th to the president of the Wasserman Company and his letters to certain officers and directors of that company did not state that the rights of Colvocoresses were intended to be conditional. Nor did they expressly state to the contrary, but other inferences are perhaps possible from the language used. The letters did point out, however, that the defendant's tenure of the tailings depended upon Reid's purchase of the mine, or on their exercising that right for him.

A possible, and perhaps probable, explanation of Barringer's alleged inconsistent acts and declarations is that he was extremely optimistic as to the value of the Congress mine tailings and dumps, and did not regard the failure of his company to exercise its option rights within the range of possibility. All of these acts were before the receipt of the unfavorable report of the metallurgist, and, therefore, long before the Wasserman Company had decided not to exercise its rights.

The bill will, therefore, be dismissed, and a decree will be entered accordingly.