ERWIN M. BUDNER and RUTH E. BUDNER,

*vs.*

LEON V. HAAS and ARLE E. HAAS, and EQUITABLE TRUST COMPANY, Successor Trustee under the will of Horace D. Clark, deceased.

*New Castle, June 25, 1953.*

*Aaron Finger* and *Louis J. Finger*, of Richards, Layton & Finger, Wilmington, for plaintiffs.

*Vincent A. Theisen*, Wilmington, for defendant, Leon V. Haas.

*Thomas Herlihy, Jr.*, Wilmington, for defendant, Arle E. Haas.

SEITZ, Chancellor: The question is whether a deed given by defendants to plaintiffs should be reformed to include certain land on the grounds either of mistake of one party known to the other or activity amounting to fraud.

The defendants owned a residence situated on a tract of 3.17 acres located on the Washington Street Extension in Brandywine Hundred. In May 1948 defendants decided to sell the residence and a portion of the tract of land. Defendants intended to retain the balance of the land. Plaintiffs responded to an advertisement of sale. Unless otherwise indicated, reference to "plaintiff" will embrace only Mr. Budner and reference to "defendant" will embrace only Mr. Haas.

If we assume that the Washington Street Extention runs north and south, the tract is on the east side thereof. Because of the curve in the road the dimensions of the tract are irregular. The whole case turns on the factual issue as to what was the agreement of the parties with respect to the southwesterly line, but which I shall call the southern boundary of the tract to be sold. The other boundaries were fixed and are not in dispute.

Defendant claims that they orally agreed that the boundary was to run straight back from a cement marker located in the front property line and was to be about two feet south of the most southerly point of the existing driveway. The deed which plaintiff seeks to have reformed is, with differences not here material, in

accordance with defendant's contention. Plaintiff claims they agreed that the southern boundary was to run in front of a row of trees which are about half way back and about 30 feet south of the deed boundary at that point.

The Supreme Court of Delaware recently stated the following principle which governs this case:

"Unless there was a clear understanding with which the formal contract conflicts, there is, of course, no comparative standard upon which to base a reformation, and the contract as executed must stand."[1]

Let us consider whether plaintiffs have proved by "clear" and "convincing" evidence[2] that they orally agreed with defendants that the so-called southern division line between the property sold plaintiffs and the property retained by defendants would run along and in front of a certain identifiable line of trees rather then, as defendants contend, approximately two feet south of the southern edge of the existing driveway.

Following a number of conversations an agreement was reached orally on June 7, 1948 and a down payment made. Presumably plaintiff and defendant agreed at that time on the southern boundary but what that agreement was is sadly now my problem.

Defendant, with plaintiff's consent, employed a surveyor to provide a description for the deed. The parties agreed to several matters other than the sale of the property, such as the rental of the plaintiffs' home, storage of some furniture, the purchase money mortgage, etc. They also agreed to use Mr. Killoran as their mutual attorney and arranged to meet with him on June 8, 1948.

Immediately after the deposit had been made, defendant made a memorandum and wrote out a description of the property which was to be conveyed. In this memorandum defendant described the boundary line in dispute as "extending directly southwest and up

---

[1] *Hob Tea Room v. Miller (Miller v. Hob Tea Room)*, Del.Ch. 89 *A.2d* 851, 857.

[2] See *Colyocoresses v. W. S. Wasserman Co.*, 26 *Del.Ch.* 333, 28 *A.2d* 588. I shall assume that the quoted words are evaluated as they were in *Southard v. Curley*, 134 *N.Y.* 148, 31 *N.E.* 330, 16 *L.R.A.* 561.

to a point approximately four feet southwest of the parallel to driveway to 4706 Washington, the land to be surveyed to determine exact boundary of southwest side." This, with changes not here material, is the boundary described in the deed. It is undisputed that plaintiff did not see this memorandum. However, it shows that defendant's position with respect to the boundary has been consistent from the time of the oral agreement.

After he had written this description, defendant was able to secure a surveyor to come and write a description which would enable the attorney to write a contract of sale. On June 8, 1948 the surveyor came to the defendants' home and dictated a description of the property based on information provided by defendant. That description describes the boundary in dispute as follows:

"Thence in a southwesterly direction by a line passing two (2) feet more or less southwest of the southwesterly edge of the driveway on these premises to a point in the aforementioned line of lands of the Mayor and Council of Wilmington, the distance of the last mentioned course to be determined by survey."

Plaintiff and defendant went to Mr. Killoran's office on the same day—June 8. Failing to see Mr. Killoran they talked with his secretary. Defendant handed the secretary the description prepared by the surveyor and the parties also gave her the terms of their agreement with respect to the other matters. Plaintiff disclaims any knowledge of the fact that a general description was then given the secretary but defendant insists that plaintiff knew of the contents. I believe such a description was given because it appeared in the agreement prepared by the attorney and dated June 11. As to whether plaintiff knew the description was given, I can only say there is no particular reason to believe one party over the other.

The surveyor's agent went on the property on June 9 and commenced to lay out the so-called southern boundary in accordance with the description given by defendant. Stakes were placed along the line. Defendant testified that while the survey was being made, he noticed that the line would cut off a corner of a parking area used in connection with the residence, and he therefore instructed the surveyor to turn the line to the south at a certain point in order to include all of that parking area. The surveyor

indicated that it was turned at defendant's direction so as to place some shrubbery on plaintiffs' side. In any event the line was changed.

Defendants testified that they went to Mr. Killoran's office with plaintiff on June 11 to sign the agreement of sale which contained the rough description dictated by the surveyor. Plaintiff in effect denies that the agreement of sale was signed on June 11 because he says that he signed papers on only one occasion and he admittedly signed papers June 19. Since I do not consider it vital to my decision I need not resolve this dispute as to the date.

Defendant called the surveyor on several occasions after the field work had been completed. Finally, on June 16, he was told that the survey had been prepared. On that date, defendant took the survey to the attorney's office and left it. Plaintiff was not advised that the survey had been taken to Mr. Killoran's office. Plaintiff claims that he called defendant several times to inquire about the survey and was told that it was not ready. He insists that he never saw any survey stakes along the line at this time.

On the settlement date, June 19, 1948, the plaintiffs and defendants went to the attorney's office. Defendants executed the disputed deed which, with differences not here material, set forth a legal description of the southern boundary in accordance with the agreement of sale. Plaintiff admitted in his testimony that the legal description would have been meaningless had he read it. A purchase money mortgage for $40,250 was signed by plaintiffs. Both instruments were on the same day recorded in the office of the Recorder of Deeds. Plaintiffs asked no questions at the meeting about the survey or the southern boundary, although the description appeared in the deed and the mortgage. Plaintiffs denied that they knew that the deed was being executed but plaintiff admitted that he knew he was signing a mortgage. Plaintiffs say they merely signed the papers as requested by the attorney and in reliance upon him. They say they thought the survey was still not completed. However, it is clear that the attorney assumed throughout the transaction that the parties had agreed upon the description of the southern boundary.

Plaintiff is a man of substantial business experience. He had purchased and mortgaged several properties. Although he testified that he always relied upon his attorneys I find it difficult to believe that he was unaware a settlement was taking place in the attorney's office especially since he knew he was executing a large mortgage. Certainly it is reasonable to infer that he was aware that a mortgage contains a description of the mortgaged property and that therefore some description of the southern boundary line was set forth therein.

A few days after the settlement date the defendants left for a European trip. They returned about the first of October and noticed that the plaintiffs were using a garden area which lay to the south of the dividing line as it appeared in the deed. Defendants were at that time not using the land retained. Defendants also noticed that the plaintiffs had erected a light pole which was south of the disputed southern boundary line. At first defendants raised no objection but a few months later, by words and conduct, they showed that they disagreed with plaintiffs' present claim as to the southern boundary.

A few months following their return from Europe, defendants commenced the construction of a large residence on the portion of the property retained. In order to finance the construction they obtained a mortgage from the corporate defendant, Equitable Trust Company. This mortgage now constitutes a lien upon the defendants' land. Plaintiffs seek no relief against defendant, Equitable Trust Company.

Plaintiffs claim that by a course of inequitable conduct which may be characterized as fraud, defendant caused the deed of conveyance to describe the property sold so that the division line therein did not conform to the line as orally agreed upon. Plaintiffs claim that defendant contrived by misleading statements and otherwise, to keep the plaintiffs "in the dark" concerning the fact that the survey had been completed and that he managed to have the deed drawn without plaintiffs' knowing that it did not describe the division line as orally agreed. Thus plaintiffs claim that defendant, by his acts, deliberately caused the plaintiffs to believe that they were receiving a conveyance with a division line as orally

agreed upon when defendant in fact knew such was not the case. Defendants flatly deny the charges.

Defendant testified that he told plaintiff that the southern boundary would run straight back from a cement marker; that it would follow the curvature of the driveway and that the line would be about two or three feet more or less south of the most southerly point of the driveway. On the other hand, plaintiff testified that the boundary was to run directly in front of a row of five or six large trees which are to be found about half way back on the tract. Plaintiff testified at another point that the starting point in the disputed boundary was "15, 20 or 25 feet south of that [the south] gate. Somewhere in that neighborhood." Elsewhere in his testimony he said the line was to be "somewhere" in front of the trees. Plaintiff denies that defendant pointed out any cement marker which was to be used as a starting point at the southern end of the front line. However, plaintiffs' brief states a willingness to take the marker as the starting point. It is obvious, however, that a concession in a brief does not aid in resolving this serious factual dispute.

Plaintiff's wife and daughter both testified that they heard the defendant say the row of trees was to be the boundary. Another witness on plaintiff's behalf testified to the same effect. Since plaintiffs themselves now admit that in the alleged oral agreement the line was to run somewhere in front of the row of trees, it is obvious that such testimony does not materially aid plaintiffs.

The court viewed the premises in question and I can only say that I would have been surprised had there not been a disagreement as to the southern boundary—and this is so without any suggestion that there is bad faith on the part of either party. I say this because the shape of the tract, the topography of the land and its wooded nature, all make it about impossible to see where the line would be unless it was suitably marked.

Plaintiff's own testimony, which he necessarily asks this court to use as the basis for finding a specific oral agreement, is far from clear. Thus he testified:

"Q. Well, then, your testimony is that on this first occasion he [defendant] took you to a point 15 feet—is that your testimony—south of that stone? A. 15, 20, 25 feet. He was very indistinct about the matter himself because of the fact that it would be subject to survey.

"Q. Well, it was understood all the way through that this was to be subject to a survey, wasn't it? A. Correct.

"Q. As you stood at that line, what did he indicate as being the southwest line of that property? A. I have tried to tell you three times now.

"Q. Well, I would like you to tell me a fourth. A. 15, 20, or 25 feet south of that gate. Somewhere in that neighborhood.

"Q. What was the length of the southwest line to the right portion of the property? A. I can't recall.

"Q. Did you walk all the way back there? A. Yes, we walked several times.

"Q. You walked through to the back line, did you? A. Yes.

"Q. And walked all around the property? A. Yes.

"Q. When you got to the back line where was the junction point of the southwest line? A. There wasn't any.

"Q. Why wasn't there? A. It had to be surveyed.

"Q. So there was no definite spot put back there, was there? A. That's right."

## At another stage we have this testimony from plaintiff:

"Q. How many feet in front of the trees did you run this line, Mr. Budner? A. I can't answer that question.

"Q. What was your understanding with Mr. Haas as to where that line was to run? A. I stated that as nearly as I could before, in that Mr. Haas didn't indicate the exact number of feet. When I questioned him he said 'somewhere in front of the trees'.

"Q. Somewhere in front of the trees? A. Yes.

"Q. Didn't you testify earlier at a prior hearing that it was directly in front? A. Well, that is directly, in my mind.

"Q. Is that the same as somewhat [sic] in front, in your mind? A. That's correct.

"Q. Is this line drawn somewhere in front of these trees or directly in front of these trees? A. It is a fair distance in front of the trees.

"Q. By that you mean it is not directly in front of the trees, is it? A. No, not directly.

"Q. You previously testified that line was to be directly in front of a line of trees, didn't you? So does this accurately represent what you said before here? A. Just what I said before.

"Q. But it is not drawn directly in front of these trees, is it? A. No."

The testimony of plaintiff's other witnesses actually is somewhat in conflict with plaintiff's own testimony because they were insistent that defendant told them the row of trees was to be the boundary. I might add that if we accept the cement marker as the front starting point of the southern boundary and run a line from that point through the row of trees it would greatly reduce the size of the rear of the retained plot. While this is not conclusive, in view of the value of the property and the purpose for which it was retained, I think it is some evidence to support defendant's contention as to the agreed location of the line. In this connection it appeared to me that plaintiff altered his version as to the agreed location of the line when, during the progress of the trial, he recognized the adverse significance of the testimony that the line of trees marked the boundary. Plaintiff's admitted uncertainty in his testimony as to the starting point and the present willingness of his counsel to accept the marker as the starting point demonstrate the difficulty of finding a definite oral agreement.

As stated, immediately after the parties reached what they thought was an oral agreement of sale, defendant recorded his understanding of the southern boundary. Since defendant entertained the same view with respect to the boundary from the inception of the agreement, it is obvious that plaintiffs in effect are charging him with a fraudulent misrepresentation, i. e., agreeing orally to one boundary and causing a different boundary to be included in the deed. In other words, there is either fraud or nothing here.

Plaintiffs rely strongly on one undisputed fact in support of their claim. They say it is obvious that they must have believed the boundary was as they claimed or they would not have planted a garden or placed a light post beyond their boundary. They say

that to so believe they must have been so told by defendant. Defendant says emphatically that he did not so tell plaintiffs. Moreover, defendants say plaintiff's own evidence is far from consistent and shows that plaintiff himself was not too clear on the boundary.

I have attempted to evaluate this evidence from all angles. I have come to the conclusion that neither party knew just where the line was to fall at the point in the southern boundary where the garden and post were located. I am persuaded that there was some attempt to approximate where the line would run but as plaintiff admits, the survey was to be the final word. Defendant may well have intimated that the line was to run somewhere in front of the row of trees. Yet such a statement would be reconcilable with defendant's testimony that he agreed to run the line straight back from the front marker with due allowance for the driveway. In view of the physical condition of the property at that place at that time, it is entirely understandable how a misunderstanding could arise because no one could tell where it would fall.

I cannot find any evidence to support plaintiffs' charge that defendant deliberately led them to believe the survey had not been completed at the time of settlement. The survey was not completed until June 16th. That may account for defendant's having told plaintiff it was not complete on the occasions when he called. We must also remember that plaintiff was greatly interested in the completion of the survey, yet he asked no questions about it at the settlement. I am unable to reconcile his testimony that he believed the survey was not completed with his knowledge that he was signing a large mortgage. Plaintiff's actions in signing the papers without question support my belief that he knew of the survey and that this case arose because of an honest misunderstanding as to the agreed line. It is also noteworthy that plaintiff apparently was given a copy of the agreement of sale at the time it was signed and it clearly reveals the boundary as contended for by defendants. Plaintiff also received a copy of the settlement sheet which indicated that he was being charged for the deed which he testified he did not know was being executed.

I conclude that plaintiffs have failed to show by clear

and convincing evidence that the parties entered into a definite oral agreement fixing a southern boundary line which is materially at variance with that boundary as it appears in the deed. It follows that I find no fraud. Plaintiffs are therefore not entitled to relief.

Order on notice.