ALVEY CONVEYOR MANUFACTURING COMPANY, a Corporation, v. KANSAS CITY TERMINAL RAILWAY COMPANY, a Corporation, Appellant.— No. 40129.—203 S. W. (2d) 606.

Division Two, July 14, 1947.

*S. W. Sawyer, John H. Lathrop, Sam D. Parker*, and *Horace F. Blackwell, Jr.*, for appellant.

*Salkey & Jones* and *Kemp, Koontz, Clagett & Norquist* for respondent; *Wilbur B. Jones* and *E. H. McVey* of counsel.

772

WESTHUES, C.—This is a suit wherein plaintiff seeks to recover of the defendant a .balance due on the purchase price of two belt conveyor systems sold by plaintiff to the defendant. The petition was in two counts. Judgment was entered for the plaintiff on the first count in the sum of $11,915.18 and on the second count for $13,766.21. Defendant appealed from the judgment.

The question in this case is whether the amounts charged by plaintiff for the conveyors sold and delivered to the defendant are reasonable. At the trial of the case, by stipulation and otherwise, the issues were narrowed and confined to the question of whether the items of overhead charged on these accounts were reasonable and proper. The facts leading up to the lawsuit were fairly stated in appellant's brief. A portion thereof reads as follows:

"Some factual background necessary to understand the issue before this Court should be stated. Because of what the United States postal authorities regarded as defendant's inadequate handling of United State mail during the Christmas rush in 1943, defendant and the railroads using its service in Kansas City were threatened in 1944 with penalties by the Post Office Department. To facilitate the mail handling, those concerned decided to extend defendant's existing system of underground belt conveyors to include movement of the mail from the trains and from the Station to its appropriate sorting points. Attempts were made by defendant to obtain the services of manufacturers other than plaintiff, but with no success, because of their various war work commitments. Plaintiff company was recommended and accordingly, defendant's officer in charge of the project (G. W. Beal, Jr., defendant's Assistant Chief Engineer) called plaintiff's office in St. Louis on August 1, 1944, asking that a representative come to Kansas City to go over the details of the proposed work with him. Peter Horn, plaintiff's Assistant Chief Engineer, came to Kansas City on August 2, 1944, for that purpose. He went over the plans with Mr. Beal and Thomas W. Avery, defendant's Assistant Engineer. Mr. Beal wanted a bid price for the two conveyors but Mr. Horn advised him that because of plaintiff's situation, it would take thirty days to build up the details of a fixed price. Mr. Beal was unable to delay

that long so the terms were left as an open price contract which both parties have here construed to mean an agreement by defendant to pay the reasonable value of the two systems. On August 9, 1944, Mr. Horn wrote Mr. Beal that the approximate prices would be $12,000 for the by-pass system (Count I) and $35,000 for the collecting belt system (Count II), the figures to be revised either up or down after final design. Accordingly, defendant secured appropriate priorities from the War Production Board in these amounts for plaintiff's use in obtaining the necessary materials. Delivery of the conveyor equipment was made to defendant during the fall of 1944 and the erection thereof completed by defendant in December, 1944.''

Defendant furnished plaintiff a plan of its Union Station Building showing where the two conveyors were to be located. Plaintiff's engineers and designers made drawings showing with particularity what materials would be necessary for the installation of the conveyors. Defendant was to and did do the installation work. Some of the material, as for example the belting, was ordered by plaintiff from the Imperial Belting Company and shipped by that company direct to the defendant. Other materials, such as rollers and hangers, were ordered by plaintiff from Stephens-Adamson Company and these were also shipped direct to defendant. Many materials, such as suspension rods, angle irons, speed reducers, etc., were fabricated in plaintiff's plant at St. Louis and then shipped to the defendant. At the trial defendant conceded that the goods delivered were satisfactory and that the conveyors were installed in time to take care of the Christmas rush. It will be noticed that plaintiff approximated the cost of the two conveyors to be $47,000, but that it was provided these figures were to be revised either upward or downward after final design. Plaintiff sent defendant invoices after the merchandise had been delivered. For the by-pass system, on which the price had been approximated at $12,000, a charge of $20,344.29 plus $406.89 sales tax was made. For the other conveyor, on which the preliminary price had been set at $35,000, plaintiff charged $31,719 plus $634.38 sales tax. When defendant received the invoices it deemed the prices to be exorbitant. Plaintiff was asked for a breakdown of the items making up the amounts charged and complied with this request. Defendant company, after examining the figures, asked plaintiff for permission to examine its books. Plaintiff agreed and an accountant examined the books for the purpose of ascertaining the method plaintiff used in making its overhead charges. Defendant concluded that a reasonable price for all of the merchandise received from plaintiff was approximately $38,000. Thereafter defendant paid plaintiff $30,000 on account, but refused to pay the full amount demanded. The by-pass conveyor account was credited with $10,000 and $20,000 was credited to the other conveyor account. Defendant at the trial and on this appeal contends that plaintiff is not entitled to a judgment in

excess $4,118 on count one and $4,105.31 on count two plus $764.47 sales tax.

Defendant urgently insists that the per cent of overhead was unreasonable. The examination of plaintiff's books revealed that the average overhead for all sales made by plaintiff during the year 1944 was 45.36%. Defendant insists that that should be the per cent of overhead charged on its account. The books of plaintiff further revealed that plaintiff divided its sales into two classes, the one, engineering sales and the other merchandise sales or all other sales. Engineering sales were such as may be termed tailor-made orders, which required special drawings or blueprints and special fabrication of articles to fit the particular job. Plaintiff's books showed that about 25% of the sales during 1944 were classified as engineering sales and 75% as all other sales. Both of defendant's orders for merchandise to construct the conveyors were classified as engineering sales and we think rightly so. Defendant introduced in evidence about fifty drawings or blueprints which plaintiff had prepared for the two orders. Plaintiff's evidence shows that the total drawings or blueprints were about seventy-five in number. As to the division of overhead, appellant in its brief made the following statement using Exhibit C as a basis. We quote from the brief:

"Plaintiff's Exhibit C purports to show the details of plaintiff's system of cost accounting in 1944, including plaintiff's allocation of overhead to direct costs. It shows the direct costs of all materials and labor used in all products sold by it in that year. It shows the various items of overhead expense incurred in that year's operations. For the purpose of allocating overhead to direct costs, it classifies sales as 'engineering sales' and 'all other sales' and plaintiff allocates overhead on an unequal basis accordingly. Plaintiff had a total volume of sales in 1944 of $2,484,109.51, of which $616,416.44 was 'engineering sales' and $1,867,693.07 was 'all other sales.' Percentagewise, 24.81% was engineering sales, 75.19% all other sales. Yet of a total overhead for 1944 of $755,559.35, plaintiff allocated $308,675.26 to engineering sales and $446,884.09 to all other sales, even though the former was only 24.81% of the total sales. Plaintiff's total direct costs for all sales for 1944 was $1,665,573.94 of which $339,103.17 was direct costs of engineering sales and $1,326,470.77 was direct costs of all other sales. Expressed percentagewise, the ratio of overhead costs to direct costs on engineering sales was 91.03% and on all other sales 33.689%. In arriving at the total of $308,675.26 overhead allocated to engineering sales, certain items of overhead were allocated 100% to that type of sale, certain other items 90%, and certain items 75%."

The evidence disclosed that for the year 1944 plaintiff company sustained a small percentage of loss on engineering sales, that is, 5.09%, and earned 5.05% on all other sales. Since the business classified as all other sales far exceeded in volume that of engineering sales the

final result was that the company had a net profit of 2.54% on its gross business.

The point upon which this case ultimately turns is whether plaintiff company was justified in making the overhead charges higher on engineering sales than on sales classified as all other sales. We are of the opinion that the method of apportioning a much larger per cent of overhead on the engineering sales was equitable and just. ▓▓▓ If overhead charges were uniform on all sales, then the purchaser of the general run-of-the-mill goods would be burdened with and made to pay a portion of the actual cost of tailor-made orders. The evidence, as we·shall see, fully sustains these conclusions. The method of apportioning overhead by plaintiff company was based on the company's actual experience over a period of years. That, as the evidence reveals, was considered a good basis. See Gordon Form Lathe Co.· v. Ford Motor Co., 133 Fed. (2d) 487, l. c. 500 (21) (22). Mr. Widmer, defendant's witness offered as an expert on this subject, testified that overhead should be based upon the experience of the company. Overhead, as we understand it, includes the continuous expense of a business irrespective of the direct costs on particular contracts. Dairymen's League Co-operative Assn., Inc. v. Holmes, 207 N. Y. (App. Div.) 429, l. c. 438. That the overhead on engineering sales is actually much higher than on other sales may be illustrated by what was required in this case. Mr. Alvey, president of plaintiff company, testified with reference to the blueprints or drawings that were necessary to fill defendant's orders. Testifying as to one of these drawings he stated:

"Here is a piece marked one item 'P-2,' 30 inches long and about 10 gauge plate. We have to take that and lay out all the holes in the lay-out department before any other work can be done. It has to be chalked, marked with a sharp tool, and center punched before it can be formed. When we finish that one piece we have to take the next one. That would be the only piece of this whole drawing that is alike. It is like making a suit of clothes to fit an individual person, on this class of work. That is the distinction I want to make between this and your merchandise equipment."

Mr. Alvey further testified that the same method of determining overhead charges on all engineering sales was used in arriving at the prices of goods sold the defendant.

John W. Snider, a certified public accountant, testified that he set up the method of overhead charges used by plaintiff company; that he based it on the company's experience over a period of years and that this method was used by other companies engaged in the same line of business. Mr. Snider also testified that the overhead charged on engineering sales by plaintiff had been determined on the basis of the amount of space, equipment, labor and engineering plaintiff company actually devoted to that class of sales. We are of the opinion that the

evidence justified a finding that the method used by plaintiff was reasonable and in conformity with good business practice.

■ Appellant states in its brief that plaintiff offered no evidence of the reasonable value of the conveyors except that of its president who testified that the defendant received a bargain. It must be remembered that defendant conceded that the direct costs on all items were proper and that the per cent of profit was reasonable. Snider testified that plaintiff's method of arriving at overhead charges was also used by other similar manufacturing companies and was an approved method of accounting. It was in evidence that plaintiff company had been in business many years and had had much experience in this line of manufacturing. From such evidence the trial court was justified in finding that the sale price was reasonable.

■ Appellant complains that the per cent of overhead charged on this account was higher than the average overhead charged on engineering sales during the year 1944. It does not necessarily follow from that that the per cent of overhead charged to defendant's account was higher or on a different basis than generally charged. One example will illustrate the point. A sale classified as engineering is made to (B). The actual labor cost is $30,000, actual cost of material $10,000. Overhead charges are figured at 300% on labor and 50% on material. The total overhead is $95,000. Another sale, also engineering, is made to (C). The actual cost of labor is $25,000, material $15,000. The same method of computing overhead as used in the sale to (B) results in a charge of $82,500, yet the total direct cost of labor and material in (B) is the same as in the sale to (C). The evidence shows that the overhead charged to the defendant company ■ on the various items was the same as charged to other engineering sales.

■ Appellant's third and final point is stated as follows:
"Even if plaintiff's accounting classification were correct, the trial court erred in requiring defendant to pay overhead items of indirect drafting, drafting supplies, commissions, proposition salaries and drawings, and expenses of the New York and Chicago offices when none of these items was involved in the work done on this contract, and erred in requiring defendant to pay the overhead claimed by plaintiff upon its sale of the belting, rollers and brackets shipped direct to defendant by other manufacturers when no overhead was incurred by plaintiff on these items, and erred in requiring defendant to pay the overhead burden claimed by plaintiff on the items of shop superintendence, cost department, rent, machinery and equipment repairs and depreciation, fire insurance, and heat and power."

The argument as to these various items is, that because the defendant was charged the actual direct costs, as for example cost of making the drawings, overhead charges should not be added. This contention is unsound. The defendant company's organization has a unit which makes drawings and blueprints from which estimates are made as to

prices on particular jobs on which the company is bidding. If the prospective customer does not enter into a contract of purchase then the expense of the drawing is a loss to the company, but such loss is taken up in the overhead charges apportioned to all sales actually made. The evidence in this case shows this to be the general practice and custom in manufacturing plants. This same argument applies to other items of overhead, such as goods ordered by plaintiff company from other manufacturing companies.

■ Appellant also stresses the fact that the defendant company made a profit on the sales in question and that the record shows the company sustained a loss on engineering sales for the year 1944. This does not mean that the defendant company was charged more than any other customer. What it does mean is, that the volume of business on engineering sales was not sufficient to take care of the fixed overhead expenses. We have not overlooked the fact that defendant was given an estimate of the cost of each conveyor. These estimates, however, were known at the time to be only approximate and there was an understanding that the final cost might be higher or lower. The estimate proved to be too low on one conveyor and too high on the other. In Gordon Form Lathe Co. v. Ford Motor Co., supra, 133 Fed. (2d) 487, 1. c. 500, we find a statement appropriate to overhead charges. It reads:

"The cost of manufactured products consists of the sum of direct costs, that is, direct material and direct labor, plus indirect costs, or manufacturing expense. Because of its indirect and general nature, manufacturing expense cannot be charged directly to each production order as can direct material and direct labor. It must therefore be distributed over production in such manner that each kind of product and each lot of work produced will be charged with its fair share of the indirect expense."

We have not discussed the particular findings of fact and conclusions of law as given by the trial court. It would serve no useful purpose to do so. This case is here to be considered de novo. Our conclusions on the merits and the result are the same as those of the trial court. The judgment is affirmed. *Bohling* and *Barrett, CC.,* concur.

PER CURIAM:—The foregoing opinion by WESTHUES C., is adopted as the opinion of the court. All the judges concur.