177 N.J. Super. 442 (1980)
426 A.2d 1076
ROBERT EINHORN AND DINAH G. EINHORN, PLAINTIFFS,
v.
CERAN CORPORATION, A NEW JERSEY CORPORATION, DEFENDANT.
Superior Court of New Jersey, Chancery Division Middlesex County.
Decided December 18, 1980.
*443 Michael J. Lunga for plaintiffs (Shanley & Fisher, attorneys).
*444 Louis Cohen for defendant (Brigiani, Gelzer, Cohen & Schneider, attorneys).
COHEN, J.S.C.
This case presents novel questions about the meaning of a price escalator clause in a contract to build a home. Defendant Ceran is a mass residential builder. It has developed Hidden Lake, a community of single homes, rental apartments and attached townhouses in North Brunswick, New Jersey. Plaintiffs Robert and Dinah G. Einhorn became interested, in the fall of 1978, in the purchase of one of the 220 planned townhouses. After they selected the model and options that suited them, Ceran sent them a form contract to sign. Some weeks of correspondence and discussion produced little change in contract language. One focus of the Einhorns' concern was the price escalator clause. Ceran insisted on the originally proposed language. The Einhorns eventually conceded and on December 4, 1978, signed the contract and made the required deposit. Ceran presumably executed the contract on the same day.
The agreed price for the townhouse was $78,800. Closing was to take place "on or about March 1979." There were clauses regarding possible delays in construction. The price escalator said:
This agreement is conditioned upon the ability of Seller to complete the unit at present prices for materials and labor. If Seller is at any time or for any reason, unable to complete the unit at the present prices for materials and labor, Seller shall have the option to cancel this contract upon written notice to Buyer, in which event the full deposit shall be returned to Buyer without interest and this agreement cancelled. However, the Buyer shall have the option of paying any increased costs of labor and material, and if Buyer, within ten (10) calendar days after notice of any increase in cost, agrees in writing to pay such increased costs at closing, this agreement shall continue in full force and effect.
The Einhorns' house was not ready, as promised, "on or about March 1979." On March 12, Ceran wrote to them that bad weather conditions and delays in material deliveries would prevent the scheduled closing. The letter invited them to get in touch with Ceran at the end of March or beginning of April, at *445 which time Ceran would be "in a better position to give [them] a more definite closing date." On June 1, a letter from the Einhorns asked Ceran for "a realistic completion date." Ceran replied in two form letters sent to them in late July in the same envelope. One, dated July 27, told the Einhorns their home should be ready between August 13 and 27 and invited them to call around August 6 for "a more definite date." The second letter was dated July 26. After calling attention to the agreed price escalator clause, the letter said:
... even though the increase of costs exceeds the sum of $8,000.00, we are exercising our right to increase the sale price by said sum of $8,000.00.
You have the right to postpone any closing to a period of ten days after receipt of this notice. If you fail to notify the seller within the said ten days of your willingness to accept said increase, then at the expiration of the said ten days the contract shall be deemed cancelled and you will be returned the monies paid on deposit.[1]
On August 1, the Einhorns' lawyer wrote to Ceran. In order to decide to accept or reject the increased price, he said, they needed some explanation of the increase. Ceran did not reply. On August 15, another letter requested an explanation. Ceran replied on August 21 saying only that its costs had risen 18-20% and asking if the Einhorns intended to accept the increase. They wrote again on August 23. They said they wanted to buy but could not decide whether to accept the increase without some information substantiating it. That letter was answered on August 30. Ceran said, "We regret we cannot give you a breakdown of our costs on this unit." Michael Kaplan, Ceran's president, testified at trial that he did not mean he was incapable of giving the Einhorns the information. Rather, he believed he had no duty to do so and meant that he would not do so. Further communication between the parties failed to resolve the matter. The Einhorns were prepared to tender the original price. Ceran would accept nothing less than the $8,000 increase. *446 Then, a meeting was arranged for October 5, at which Michael Kaplan read to the Einhorns a list of cost categories and what he said were the increases therein. He revealed neither Ceran's originally expected costs nor its allegedly greater actual costs. He gave no dates of increases or other explanation of any kind. The increases were read at the meeting from an untotalled list which Kaplan kept and produced at trial. He testified the listed increases totalled some $12,000 or $13,000. In fact, they totalled more than $16,000. Kaplan testified Ceran did not seek to pass on all of the increases but, rather, decided to absorb some of them out of its own profits.
Kaplan explained at trial how the list of increases was compiled. In early September 1978, he said, a townhouse price list was established on the foundation of then current costs of labor and materials. It was those costs that formed the baseline for the increases. They were subsequently compared with the costs Ceran actually incurred for the Einhorns' home over the ensuing 12 months and the differences tallied.[2] No effort was made to segregate cost increases occurring before December 4, 1978, the date the Einhorns signed the agreement, or those occurring after March 1979, when the closing was originally to take place.
After the October 5 meeting, a closing took place by order of this court. The Einhorns paid $78,800 to Ceran. They paid $8,000 to the clerk of the Superior Court subject to this decision whether the parties' agreement and their conduct legitimated the price rise demanded by Ceran. For the following reasons, I hold that the Einhorns are entitled to a full return of the funds held by the clerk.
Apart from the escalator clause, the parties' agreement is a usual one. It sets a price, an approximate closing date, terms for obtaining mortgage financing, an identification of the developer's model and optional extras selected, and provisions for *447 defaults and delays. The only novel language is the price escalator. The Einhorns attack the language as permitting Ceran unrestrained control over the purchase price. Either that, they argue, or the builder is obliged, when claiming a price increase, to afford the buyers information supporting it. Ceran argues that the escalator bars enforcement of the agreement except on the builder's terms and that, in any event, the Einhorns never accepted the increase or rejected it, and therefore cancelled the agreement. For that reason, Ceran concludes, the court should not have ordered specific performance and the Einhorns have no enforceable rights at this time.
Price escalator clauses are not uncommon in the commercial world. One who buys goods or services from another may validly bind himself to pay price changes designed to reflect rises in the seller's costs. In times when cost rises are expected and only their future rate or amount are unknown, price escalators sensibly adjust the legitimate needs of the parties. Not every price escalator, however, may be enforceable. Ceran contends that upon any cost rise it may opt to cancel. Plainly, that is so. It further contends, however, that it has no further duty to the buyers than to make them a new offer to sell, at a price that it chooses without limitation, justification or explanation. Equally plainly, that is not so.
Ceran's argument ignores its own contract language that gives the buyers "the option of paying any increased costs of labor and material." That option is one the buyers can sensibly deal with only if they have before them facts sufficient to enable a reasonable person to determine whether the claimed cost increases are real. Those facts are peculiarly, if not exclusively, known by the builder. To enable the buyers to make an informed decision, therefore, the builder must share his knowledge with them. By seeking price adjustment based on increased costs, he waives his right to keep his costs a secret. It would be unfair and unworkable to require the buyers to make their decision blindfolded. Without prompt and sufficient information, *448 the buyers can ascertain whether they have been fairly treated only through the undesirable means of post-closing litigation.[3]
Ceran's argument also ignores the reality that the buyers' choice whether to pay arbitrary or unexplained claims of cost increase will not often be a freely exercisable choice. The dilemma will often face them only weeks before completion of the home. By that time, job and school changes have already been scheduled. Contracts to sell former homes have been signed or apartment leases permitted to expire. Buyers have already committed money to mortgage applications, legal services, home furnishings and other costs that are normally not recoverable. They have invested emotionally in many facets of their move. It is unrealistic to treat such people as though they were newly contracting parties with real freedom to make new choices. It is unrealistic to say they may consider newly made demands for price increases in the same way they could have done if the demands had been made at the inception of the transaction.
Ceran's contract must, therefore, be read to require that, when seeking a price increase for cost rises, the builder may demand no more than his real rise in costs and the builder must furnish the buyers facts sufficient to enable a reasonable person to determine whether the demand reflects real cost rises. But, Ceran argues, the Einhorn agreement does not say that and the court should not make a better contract than the parties have themselves agreed upon. There are two answers.
*449 The first answer is that home buyers who are required to make a decision whether to pay alleged increased costs have the right to information adequate to the purpose. And, the information can, as a practical matter, come only from the builder. The second answer is that if the builder's duty to inform the buyer accurately and adequately is not expressed in the agreement, the court may construct that duty. Where fairness and justice require, the court may impose upon a contract a duty required to effectuate the implicit covenant of good faith and fair dealing necessarily involved in the parties' contractual relationship. Palisades Properties, Inc. v. Brunetti, 44 N.J. 117 at 130 (1965). A term may be found in a contract to give it the effect the parties, as fair and reasonable people, presumably would have chosen if they had thought to express themselves on the subject. Renee Cleaners, Inc. v. Good Deal, etc., N.J., 89 N.J. Super. 186 (App.Div. 1965); Mortgage Corp. of N.J. v. Manhattan Savings Bank, 71 N.J. Super. 489 (Law Div. 1962) (applying New York law).
In order to be enforceable, a price escalator in a developer's contract must be fairly administrable. It may expressly require proof of his cost rises. Lincoln Rug Co. v. East Newark Realty Corp., 142 N.J. Eq. 743 (E. & A. 1948). It may permit price rises measured by agreed standards other than the seller's actual costs. In other settings price escalators adjust price with changes in the cost of a commodity, Ames v. Quimby, 96 U.S. 324, 24 L.Ed. 635 (1987), or changes in pay rates, Cub Fork Coal Co. v. Fairmount Glass Works, 33 F.2d 420 (7 Cir.1929), or changes in posted prices to all customers, Bethlehem Steel Co. v. Turner Construction Co., 2 N.Y.2d 456, 161 N.Y.S.2d 90, 141 N.E.2d 590 (Ct. of App. 1957), or changes in an index of price changes compiled by a government agency. Department of Water and Power v. Okonite-Calendar Cable Co., 181 F.2d 375 (9 Cir.1950). Without some other verifiable or calculable standard, the buyer can be charged only the builder's actual cost increases and he must be prepared to demonstrate them sufficiently for the buyer to ascertain whether they are real. See *450 Alvey Conveyor Mfg. Co. v. Kansas City Terminal R. Co., 356 Mo. 770, 203 S.W.2d 606 (Sup.Ct. 1947); E.F. Pritchard Co., Inc. v. Heidelberg Brewing Co., 307 Ky. 833, 212 S.W.2d 293 (Ct.App. 1948). Research has not disclosed a single reported case in which either a commercial buyer or a consumer had to pay a price increase solely on the seller's say-so that his costs had risen.
Plainly, Ceran did not furnish the Einhorns facts sufficient to enable them reasonably to ascertain whether the claimed cost rises were real. Kaplan first declined to say anything beyond the amount of the price increase. After two months of demands, he did no more than read to the Einhorns a list of some 30 categories and amounts of cost rise. He gave no contemplated or actual costs, or dates of increase.
Additionally, as it turned out at trial, Ceran sought an increase based on cost rises part of which it may not have been entitled to. Increase was sought for cost rises that already took place before the contract was signed by the Einhorns. The escalator speaks of Ceran's inability "to complete the unit at the present prices." Unless the parties understand otherwise, a contract speaks as of the date it was signed. Ceran's baseline for cost rises, therefore, was December 4, 1978, costs and not early September costs. McDaniel v. Franklin Ry. Supply Co., 20 Del. Ch. 327, 174 A. 375 (Del.Chan. 1934). If "present prices" were early September prices, as Kaplan asserted, Ceran's price of $78,800 would already have been outdated when promised because already subject to three months of cost rises. Furthermore, the claimed cost rises included those that occurred up to five months after the promised closing. The question whether the delays were wholly or partially excusable was not fully tried. What is clear is that Ceran agreed in early December to build a home by the end of March for a price plus cost increases occurring between December 4 and the closing. It finished the home in early September 1979 and sought to pass on 12 months of undocumented cost increases, three months of which were already in the base price.
*451 Without performing its duty of furnishing the necessary information to the Einhorns, Ceran could not impose any price increase upon them. Ceran never properly exercised its option to cancel or increase its price. Thus, the Einhorns were never properly put to the choice of accepting or rejecting the increase. Ceran was, therefore, dutybound to perform at the originally agreed price. It is no matter that Ceran may now be able to prove some legitimate cost increases. It did not do so when it should have done. It may not now make to the court the showing it should have made to the Einhorns in August 1979.
Judgment will be for plaintiffs with costs. Counterclaim dismissed. Plaintiffs' prayer for attorneys' fees denied.
NOTES
[1] Note that Ceran wrote that it was exercising its right to increase the price. That is not exactly what the price escalator authorized Ceran to do. The parties have correctly treated the difference as immaterial.
[2] Kaplan was not asked if the September townhouse prices anticipated any cost increases or was tightly tied to their current costs.
[3] Two out-of-state cases appear to be contrary. In both of them, options to purchase lands for the owners' costs were held not to entitle the optionee to notice of the amount of the owners' costs until he commits himself to buy. Kenyon v. Suburban Realty Corp., 244 Mass. 571, 139 N.E. 172 (Sup.Jud.Ct. Mass. 1923); Stokes v. Carpenter, 166 App.Div. 441, 151 N.Y.S. 1000, aff'd, 218 N.Y. 705, 113 N.E. 1067 (1915). Both cases arose in commercial settings in the early part of this century. Compare Carter Coal Co. v. Litz, 54 F. Supp. 115, 130 (W.D.Va. 1943), where an option to purchase at the seller's costs were held not to require the seller to calculate those costs before exercise of the option unless the seller had exclusive knowledge of the facts.